# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Anthony Steven Hill,

Civ. No. 14-1578 (DSD/BRT)

                Plaintiff,

v.

Leon Malachinski; T. Warner; MN D.O.C.;
Kristofer Lund; Corizon; Vickie Pohlmann;
Sgt. Conner;[1] Nurse Karow; and Unknown
Watch Commander,

**REPORT AND
RECOMMENDATION**

                Defendants.

---

Anthony Steven Hill, MCF-Faribault, 1101 Linden Lane, Faribault, MN 55021, *pro se* Plaintiff.

Andrea Pavelka Hoversten, Esq., Geraghty, O'Loughlin & Kenney, PA; and Jonathan D. Moler, Esq., Minnesota Attorney General's Office, counsel for Defendants.

---

BECKY R. THORSON, United States Magistrate Judge.

      Anthony Steven Hill, a state prisoner housed at the Minnesota Correctional

Facility in Faribault, has filed a *pro se* civil rights complaint under 42 U.S.C. § 1983,

alleging that he was denied adequate medical care for his cervical dystonia in violation of

his Eighth Amendment rights. (Doc. No. 1, Compl. ¶¶ 22–30.) Hill seeks a declaration

that the actions of Defendants Minnesota Department of Corrections, Corizon LLC,

---

[1]      Sergeant Lisa Connors' surname is misspelled in the complaint as "Conner." (*See* Compl. 1; Doc. No. 73, Ex. A., Aff. of Lisa Connors ("Connors Aff.") 1.) In addition, while Connors refers to herself as a correctional officer, it is clear that she has been promoted to the rank of sergeant. This Court will therefore refer to her throughout this Report and Recommendation as Sergeant Lisa Connors or Sergeant Connors.

Dr. Leon Malachinski, Dr. Kristofer Lund, Officer Vickie Pohlmann, Sergeant Lisa

Connors, Nurse Nola Karow, Nurse T. Warner, and an unknown watch commander have

violated the Eighth Amendment.[2] (*Id.* ¶¶ 31–39.) He also requests a total of $1.5 million

in compensatory and punitive damages, as well as injunctive relief in the form of

botulinum toxin (*i.e.*, Botox) injections in his face and legs to counteract the spasms

caused by his dystonia, evaluations by a neurologist and speech pathologist, an MRI scan,

and a steroid shot in his back. (*Id.* ¶¶ 31–46.)

This matter is now before the Court on Defendants Corizon LLC, Dr. Malachinski,

and Dr. Lund's (collectively "Corizon Defendants") motion for summary judgment and

Defendants Minnesota Department of Corrections, Sergeant Connors, Nurse Karow, and

Officer Pohlmann's (collectively "DOC Defendants") amended motion for summary

judgment. (Doc. No. 64, Corizon Defs.' Mot. for Summ. J.; Doc. No. 77, DOC Defs.'

Am. Mot. for Summ. J.) For the reasons stated below, this Court recommends that the

Defendants' motions for summary judgment be granted, and that Hill's motion in

opposition to summary judgment (Doc. No. 78) be denied.

## I.  BACKGROUND

Anthony Hill suffers from a self-described "tic disorder," diagnosed by Dr. Ronald

Hardrict—a psychiatrist board certified in neurology—as cervical dystonia. (Compl. ¶¶ 8,

---

[2]     Corizon LLC, a private medical services vendor, held a contract with the
Minnesota Department of Corrections to provide medical care to state inmates, which it
did through its employees, including Drs. Malachinski and Lund. (*See* Doc. No. 71, Aff.
of Dr. David Paulson ("Paulson Aff.") ¶¶ 1, 3.) Its contract expired on December 31,
2013, at which time the Department of Corrections contracted with a different medical
services vendor, Centurion. (*Id.* ¶ 3.)

17; Doc. No. 65, Ex. C, Medical R. at 50.) A rare and incurable condition of often unknown origin, dystonia is characterized by involuntary muscle spasms of varying severity that may result in repetitive or twisting movements of the affected body parts and chronic pain. (*See* Paulson Aff. ¶¶ 47–48; Doc. No. 65, Ex. A., Decl. of Dr. Leon Malachinski ("Malachinski Decl.") ¶ 7; Doc. No. 81, Exs. 4, 7.) While dystonia manifests itself through muscle spasms, most spasms are symptomatic of more common and non-chronic conditions, such as muscle fatigue, injury, or inflammation; improper posture; electrolyte imbalances; or stress or anxiety. (Malachinski Decl. ¶¶ 7, 10, 69.) Although dystonia cannot be cured, its symptoms can sometimes be managed through certain medications, muscle relaxants, physical therapy, a neck brace, stretches, and Botox injections. (*Id.* ¶ 7; Paulson Aff. ¶¶ 47–48; Doc. No. 81, Exs. 4, 7) Hill claims that the Defendants acted with deliberate indifference to his serious medical needs, in violation of the Eighth Amendment's ban on cruel and unusual punishment, by delaying or otherwise denying him certain medications, treatments, and accommodations for his cervical dystonia. (Compl. ¶¶ 22–30.)

## A. Course of Medical Care and Treatment

On the evening of January 7, 2012, Hill first complained to correctional staff that he was experiencing severe neck pain and having trouble holding his head up without the aid of his right hand.[3] (Compl. ¶¶ 1–3.) He submitted a request for a medical evaluation

---

[3]     For purposes of summary judgment, the facts are drawn from the evidence, whether in the form of affidavits, sworn declarations, or medical records, viewed in the light most favorable to Hill. The facts are not based on unsworn statements or allegations

(Footnote Continued on Next Page)

3

the following day and, on January 9, 2012, was examined by Dr. Leon Malachinski. (*Id.*

¶¶ 3–4.) Hill informed Dr. Malachinski that he had developed neck, back, and head pain,

as well as uncontrollable facial gestures centered around his mouth, a few weeks earlier.

(*See* Malachinski Decl. ¶ 9; Medical R. at 71.) Dr. Malachinski's examination revealed

no neurological deficits identifiable through symptoms like gait disturbance and

decreased reflexes, though he detected increased cervical spasm — *i.e.*, knots and tension

in Hill's neck. (*See* Malachinski Decl. ¶ 9; Medical R. at 71.) Dr. Malachinski tentatively

diagnosed Hill with cervical myositis, an inflammatory response that leads to neck pain

and spasms; prescribed Robaxin, a muscle relaxant, three times daily for two weeks; and

referred Hill to a dentist to evaluate whether Hill's facial grimacing was the result of any

structural abnormalities of the mouth. (*See* Malachinski Decl. ¶ 9; Medical R. at 71;

Paulson Aff. ¶ 11.) The next morning, Hill asked Sergeant Lisa Connors if he could be

excused from his work assignment as a janitor due to neck pain. (*See* Connors Aff. ¶ 2;

Compl. ¶ 6.) Under DOC policies, inmates can be excused from work by obtaining a

medical restriction or medical authorization from health services staff; otherwise, they are

permitted three "lay-ins" (*i.e.*, sick days) every ninety days. (*See* Paulson Aff. ¶ 8;

---

(Footnote Continued from Previous Page)
that are not corroborated by actual evidence in the record, save for a few exceptions to
provide context. *See Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 421 (8th Cir.
2011) ("[B]ecause allegations alone are insufficient to survive a summary judgment
motion, a plaintiff . . . must set forth by affidavit or other evidence specific facts, which
for the purposes of the summary judgment will be taken as true."); *Reed v. City of St.
Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009) ("A plaintiff may not merely point to
unsupported self-serving allegations, but must substantiate his allegations with sufficient
probative evidence that would permit a finding in his favor.") (quotation omitted).

Connors Aff. ¶¶ 2–3.) After contacting health services and determining that Hill had not obtained a work restriction, Sergeant Connors denied Hill's request but explained that he could use one of his lay-in days. (Connors Aff. ¶ 2.) Hill opted to work rather than use a lay-in. (Compl. ¶ 6.)

On January 14, 2012, a correctional officer reported to health services that Hill was experiencing facial and neck spasms. (Malachinski Decl. ¶ 11; Medical R. at 78.) A nurse encouraged Hill to continue taking Robaxin and scheduled him for a follow-up appointment with a doctor. (Malachinski Decl. ¶ 11; Medical R. at 78.) Dr. Kristofer Lund examined Hill on January 17, 2012, finding that Hill's neck spasms had resolved and that his neck muscles had "good flexibility" with a "full range of motion" and no weakness, but that Hill was still experiencing some pain, exhibiting rigidity in his cervical spine, and displaying "peculiar facial grimacing that occurred [on] an almost constant basis." (Medical R. at 70; *see also* Doc. No. 65, Ex. B, Aff. of Dr. Kristofer Lund ("Lund Aff.") ¶ 11; Paulson Aff. ¶ 12.) Dr. Lund suspected that the facial grimace was a learned tic and had Hill perform certain stretches while humming a tune in his head, which promptly relieved the grimacing. (Lund Aff. ¶ 11; Medical R. at 70.) Dr. Lund recommended stretches, prescribed a thirty-day trial of anticonvulsant Neurontin to address Hill's residual pain, and directed him to follow up with health services if he continued to have problems. (Lund Aff. ¶ 11; Medical R. at 70.)

Although the Neurontin provided Hill with "some relief," he alleges that he independently researched his "[t]ic disorder," determined that it should be treated with Prolixin or Orap, and submitted another request for a medical evaluation on January 31,

2012, to discuss his findings with Dr. Lund. (Compl. ¶¶ 8–9.) During that visit, Dr. Lund noted that the pain associated with Hill's muscle spasms and facial tics had improved, but that he was exhibiting slurred speech with a slight "barking" sound emanating from the back of his throat. (*See* Lund Aff. ¶ 12; Medical R. at 69.) Dr. Lund suspected that the sound was due to an atypical allergic reaction to Lisinopril, which Hill had previously been prescribed for hypertension, and discontinued the medication. (*See* Lund Aff. ¶ 12; Paulson Aff. ¶¶ 11, 13; Malachinski Decl. ¶¶ 8, 13.) Dr. Lund also restarted Hill on Robaxin based on his report that his muscle spasms had increased after his prescription had expired. (Lund Aff. ¶ 12; Medical R. at 69.) Dr. Lund later replaced Robaxin with another muscle relaxant, Flexeril, to see how it impacted Hill's neck issues and, suspecting that Hill might have tetany (*i.e.,* involuntary muscle spasms) due to low magnesium levels, started him on magnesium oxide. (*See* Lund Aff. ¶ 13; Paulson Aff. ¶ 14.) While Hill claims that he asked Dr. Lund about Prolixin and Orap, he has not presented any evidence to support that allegation. (*See* Compl. ¶ 9; Medical R. at 69.)

Dr. Malachinski reexamined Hill on February 6, 2012, for a "stiff neck." (Medical R. at 69.) Dr. Malachinski found increased tenderness throughout Hill's cervical musculature, which was consistent with cervical myositis, referred Hill to a physical therapist for help with neck exercises, and scheduled x-rays on Hill's back and neck, which showed mildly exaggerated curvature on his cervical spine but were otherwise within normal limits. (*See* Malachinski Decl. ¶¶ 15–16; Paulson Aff. ¶¶ 15–16; Medical R. at 19, 68.) Hill subsequently exhausted his three permitted lay-in days on February 9,

11, and 12. (Compl. ¶ 10.) He alleges that the lay-ins were necessary due to his worsening medical condition in the days following his February 6 appointment. (*Id.*)

On February 17, 2012, Hill informed health services staff that he was experiencing severe pain from his spasms and requested to see a doctor to renew his prescriptions for Neurontin and Flexeril, both of which had expired two days earlier. (Malachinski Decl. ¶ 17; Lund Aff. ¶ 16.) Because Neurontin and Flexeril are "non-formulary medications" that are highly abused in the prison setting, they must be specially ordered from an outside vendor after examination and approval by a medical provider. (*See* Paulson Aff. ¶ 51; Lund Aff. ¶ 18; Malachinski Decl. ¶ 18.) An unidentified nurse advised Hill that there were no appointments available that day and that he would have to wait until Dr. Lund returned to work on February 22, 2012, to have his prescriptions refilled. (*See* Paulson Aff. ¶ 17; Lund Aff. ¶ 16; Malachinski Decl. ¶¶ 17–18.) Hill declined the nurse's offer of over-the-counter pain medications. (Lund Aff. ¶ 16; Malachinski Decl. ¶ 17; Paulson Aff. ¶ 17.) The nurse did not inform Dr. Malachinski that Hill was in severe pain. (Malachinski Decl. ¶ 18.)

Between February 17 and February 22, there were no reports to health services that Hill was suffering from severe pain or was otherwise unable to perform daily activities. (Lund ¶ 26.) When Dr. Lund returned to work and evaluated Hill on February 22, Hill reported that stretching had improved his discomfort and Dr. Lund found that Hill was not in severe pain requiring immediate analgesics. (Lund Aff. ¶¶ 20, 26.) Nevertheless, based on Hill's reports of continuing spasms, Dr. Lund ordered lab tests to rule out any "occult inflammatory process" and to check Hill's magnesium levels, and

refilled Hill's prescriptions for Neurontin and Flexeril. (*See* Lund Aff. ¶ 20; Medical R. at

67.) Dr. Lund later reordered those prescriptions on February 27, 2012.[4] (Lund Aff. ¶ 23.)

Although the Flexeril became available on February 27, DOC records indicate that Hill

did not attend pill call to receive it until March 6, 2012. (*See id.*; Medical R. at 236, 240.)

Even before Hill had requested refills of Neurontin and Flexeril, he had missed pill call

on several occasions, which resulted in him not taking sixteen of his forty-one doses of

Flexeril and twenty seven of his eighty-nine doses of Neurontin. (Lund Aff. ¶¶ 19, 27;

Medical R. at 240, 245.) Because the Neurontin prescription was apparently "on hold"

due to "some problems with the company [that] provided the medicine to the DOC"

(Compl. ¶ 12), it did not become available for Hill to pick up until March 8, 2012. (Lund

Aff. ¶ 23; DOC Medical R. at 237.)

Through Dr. Malachinski's referral, Hill saw a registered physical therapist, Darin

Haugland, on March 5, 2012. (*See* Malachinski Decl. ¶ 22; Paulson Aff. ¶¶ 15, 19;

Medical R. at 79.) Haugland commented on Hill's "very unusual medical history" of

"extensive neurological twitches, cervical tightness, and associated pain," and concluded

that Dr. Lund's course of treatment, including magnesium oxide and Flexeril, had either

"significantly reduced [the] severity" of Hill's spasms or "should be very helpful."

(Medical R. at 79.) Haugland fitted Hill with a cervical collar (*i.e.* neck brace) to provide

further relief, which "immediately reduced some of the pain and helped with the pain-

---

[4]     It is unclear from the evidence in the record why Dr. Lund had to reorder the
Neurontin and Flexeril prescriptions on February 27, 2012. (*See* Lund Aff. ¶ 23 ("I do not
recall why I re-ordered the medication").)

spasm cycle," and showed Hill some stretches and how to improve blood flow through gentle movements and massage. (*Id.*) That same day, Dr. Lund started Hill on calcium carbonate, as low calcium is one possible cause of uncontrolled muscle spasms. (Lund Aff. ¶ 29; Medical R. at 295.) During a follow-up visit on March 13, 2012, Hill informed Haugland that the cervical collar was "dramatically helpful" but that he was still having some facial tics. (Medical R. at 79; *see also* Lund Aff. ¶ 30.)

Between March and July 2012, Hill saw Drs. Lund and Malachinski on several occasions for his elevated blood pressure, a hamstring strain that he had suffered while jogging, and to have his Neurontin prescription renewed. (*See* Malachinski Decl. ¶¶ 25–28; Lund Aff. ¶¶ 31–34.) In response to Hill's repeated requests to have a psychiatrist or other specialist examine his muscle spasms, Nurse Nola Karow wrote a referral for a psychiatric evaluation on July 23, 2012. (*See* Compl., Attach. 1 at 3–6; Paulson Aff. ¶ 53; Lund Aff. ¶ 34; Doc. No. 72, Aff. of Nola Karow ("Karow Aff.") ¶ 5.) Dr. Lund agreed and referred Hill to Dr. Ronald Hardrict—a psychiatrist board certified in neurology—on a priority basis. (*See* Lund Aff. ¶¶ 34–35; Paulson Aff. ¶ 26.) Before the scheduled psychiatric appointment, Drs. Lund and Malachinski examined Hill on August 13 and August 30, 2012, respectively. (*See* Lund Aff. ¶¶ 35, 38; Medical R. at 66.) Dr. Lund noted that Hill had "partial control of his pain" but continued to have facial tics, and he renewed Hill's prescription for calcium carbonate until the psychiatrist could identify "alternative agents to use for his tic." (Medical R. at 66.) Dr. Malachinski, who saw Hill for leg cramps, reordered Robaxin for thirty days and scheduled lab tests to "[r]ule out

electrolyte imbalance" as the cause of Hill's spasms. (*Id.*) Those tests came back normal. (Malachinski Decl. ¶ 33.)

Dr. Hardrict first examined Hill on October 5, 2012, and based on his medical history, noted a "differential diagnosis [of] dystonia, acute torticollis, and possible conversion disorder." (Medical R. at 50). Dr. Hardrict prescribed Cogentin and Haldol for cervical dystonia and continued Hill on muscle relaxants, Neurontin, and a cervical collar, noting that they had provided him with "some benefit" and "some relief." (*Id.*; *see also* Paulson Aff. ¶ 26; Malachinski Decl. ¶¶ 30, 34.) After Hill experienced an allergic reaction to Cogentin and Haldol, Dr. Hardrict prescribed Prolixin, used to treat Parkinson's disease and similar symptoms, on October 22, 2012. (*See* Medical R. at 47; Paulson Aff. ¶ 27.) The Prolixin, however, had no significant impact on Hill's symptoms and was replaced with Amandatine, another medication used to treat Parkinson's-like symptoms, on December 31, 2012. (*See* Medical R. at 41, 43; Paulson Aff. ¶¶ 28, 30.) Dr. Hardrict continued Hill on the Neurontin and Flexeril prescribed by Drs. Lund and Malachinski because they provided him with some relief. (Medical R. at 39, 41.)

Dr. Hardrict treated Hill into the spring of 2014, examining him on nine separate occasions over the span of nineteen months. (*See* Paulson Aff. ¶¶ 26–28, 30–32, 34, 36, 39.) Hill also saw two additional physicians and a physician's assistant, and was temporarily transferred to a minimum custody unit in Red Wing, Minnesota, for a neurological consult. (*See id.* ¶¶ 38–45; Malachinski Decl. ¶ 58.) By April 2014, Hill's condition appeared to have substantially improved; although he continued to suffer from some muscle stiffness and facial paralysis, he rarely wore his cervical collar, was free of

10

pain, worked as a janitor, jogged and played basketball, and was weaned off Amantadine and Neurontin. (*See* Malachinski Decl. ¶¶ 40–54; Medical R. at 31.) Indeed, on February 7, 2014, a nurse noted that Hill's dystonia was in remission. (Malachinski Decl. ¶ 52.) A month later, however, Hill complained to Dr. Linda Thompson that he was having leg spasms and requested an MRI. (Malachinski Decl. ¶ 55; Medical R. at 62.) During a follow-up visit on May 29, 2014, Dr. Thompson found no cervical spine tenderness, muscle spasms, or "anything in the cervical neck or anywhere," though she did note that Hill exhibited intermittent jaw movements that might require further investigation. (Medical R. at 61.) Dr. Thompson questioned whether Hill had "true dystonia" and requested a neurological consult to "firm up a diagnosis." (*Id.*; *see also* Malachinski Decl. ¶¶ 56–57.) Hill eventually saw a neurologist, Dr. Karen Truitt, on July 24, 2014. (*See* Medical R. at 26.) Dr. Truitt concluded that Hill's history was "consistent with cervical dystonia," but found that it had "spontaneously resolved" and that there was "no evidence" of it during her examination. (*Id.* at 26–28.) Based on a "tightening of the left side of his mouth and face," however, Dr. Truitt diagnosed Hill with oromandibular dystonia[5] and prescribed Levodopa. (*Id.*).

The Levodopa, however, did not relieve Hill's facial tics and, on February 11, 2015, it was replaced with Clonazepam, which also did not help. (*See* Medical R. at 57–58; Malachinski Decl. ¶¶ 66–68; Paulson Aff. ¶ 46.) During much of this time, and beginning in February 2014, Hill had repeatedly asked his treating physicians to prescribe

---

[5]    Oromandibular dystonia affects the muscles of the jaw, lips, and tongue. (*See* Doc. No. 81, Ex. 7.)

Botox injections instead of, or in addition to, his prescribed medications. (Paulson Aff. ¶¶ 38–39, 41.) The doctors initially demurred, either because Botox injections were not feasible while Hill was incarcerated or because Hill's condition had improved. (*See Id.* ¶¶ 38; Medical R. at 61, 63.) Indeed, Botox injections cannot be administered on-site at a DOC facility, nor are they approved by the Food and Drug Administration to treat cervical dystonia. (Paulson Aff. ¶ 49.) Nevertheless, as of March 5, 2015, Hill's medical providers requested a neurological follow-up concerning possible Botox treatment. (Malachinski Decl. ¶ 68.)

## B.  Requests for Bag Lunches and a Lower Bunk Accommodation

As a result of his neck spasms, Hill alleges that he could not eat at the dining hall and therefore requested bag lunches. (Compl. ¶ 18.) DOC policy mandates that inmates request sick call and visit a doctor to receive a medical restriction noting the need for bag lunches. (Connors Aff. ¶ 3.) Under that policy, inmates bear the responsibility of reporting to a doctor to request medical restrictions, and the treating doctor is responsible for determining whether a requested restriction is medically necessary. (*Id.*) Correctional officers do not have the authority to grant such requests. (Paulson Aff. ¶ 54.) Hill alleges that he requested a bag lunch from Sergeant Connors sometime in March 2012, which she denied. (Compl. ¶ 18.) There is no evidence, however, that he had requested and received a meal restriction from his treating physicians. (*See* Paulson Aff. ¶ 54.)

On the evening of August 29, 2012, Hill visited health services with complaints that he was having a stroke. (Connors Aff., Ex. A.) Officer Vickie Pohlmann called two nurses to examine Hill. (Doc. No. 74, Aff. of Vicki Pohlmann ("Pohlmann Aff.") ¶ 2.)

The responding nurses concluded that Hill's vital signs were stable, his speech clear, and that he was not exhibiting any "signs of one sided weakness." (Connors Aff., Ex. A.) After the nurses determined that Hill's condition was stable, Officer Pohlmann informed him that he needed to return to his living unit. (*Id.*) Hill again requested a bag lunch, stating that his pain was so severe that he was unable to eat at the dining hall. (Compl., Attach. 1 at 5.) Officer Pohlmann denied the request, but one of the nurses offered Hill a wheelchair. (Connors Aff., Ex. A.) Hill refused a wheelchair and left the area of his own free will. (*Id.*)

Aside from his requests for bag lunches, Hill also alleges that he repeatedly asked Drs. Malachinski and Lund for a lower bunk accommodation, beginning on January 18, 2012. (Compl. ¶¶ 7, 9, 12, 14, 25.) His medical records, however, indicate that he did not immediately request a lower bunk and, after he was diagnosed by Dr. Hardrict with cervical dystonia, Dr. Lund authorized a lower bunk accommodation on November 27, 2012. (*See* Paulson Aff. ¶ 52; Lund Aff. ¶¶ 43, 64.) When the authorized accommodation expired one year later, Hill again requested a lower bunk accommodation due to his dystonia. (Malachinski Decl. ¶ 49.) He told Dr. Malachinski that the lower bunk's configuration was different than the upper bunk and that he could better rest his neck on the lower bunk. (*Id.*) Dr. Malachinski directed the nursing supervisor, John Gemlo, to evaluate Hill's cell; Gelmo reported that there were no differences between the upper and lower bunks. (*Id.*) Based on that report and Hill's substantially improved condition, as evidenced by his working as a janitor, jogging, and playing basketball, Dr. Malachinski concluded that a lower bunk accommodation was no longer medically necessary. (*Id.*)

**C. Hill's Attempts at Exhausting Administrative Remedies**

On April 16, 2012, more than three months after his spasms began and more than one month after he had been fitted with a cervical collar, Hill submitted a written kite[6] and a formal grievance to an on-duty nurse, expressing frustration that he was "not getting better," complaining about the erstwhile delay in receiving his refills for Neurontin and Flexeril, and requesting to see a specialist. (Medical R. at 100–02.) In accordance with the DOC's established grievance procedure, the nurse informed Hill that he had to submit kites and follow them up the chain of command before filing a formal grievance with the prison's grievance coordinator, not health services. (*Id.* at 100; *see also* Ebeling Aff. ¶ 3 & Ex. A at 1–2.) Hill later wrote multiple kites to Nurse Karow on July 17, August 6, and September 17, 2012, expressing his dissatisfaction with his current treatment, requesting to see a psychiatrist or other specialist, and requesting that his psychiatric referral be expedited. (*See* Compl., Attach. 1 at 3–6; Karow Aff. ¶ 5.) Nurse Karow wrote a referral to have Hill examined by a psychiatrist on July 23, 2012, and asked that Hill's psychiatric appointment be expedited on September 21, 2012. (*See* Compl., Attach. 1 at 3, 6; Karow Aff. ¶ 5; Lund Aff. ¶ 34.) Hill never resubmitted his earlier grievance or filed any additional ones.

---

[6]     A "kite" is an intra-prison communication, often used to informally resolve disputes before a formal grievance is filed. (*See* Doc. No. 75, Affidavit of Kim Ebeling ("Ebeling Aff.") ¶ 3 & Ex. A.)

**D. Hill's Complaint**

On May 19, 2014, Hill filed this civil rights action, alleging that the Defendants violated the Eighth Amendment's ban on cruel and unusual punishment by acting with deliberate indifference to his medical needs. (Compl. ¶¶ 22–30.) Specifically, Hill claims that the DOC Defendants, including Officer Pohlmann, Sergeant Connors, and Nurse Karrow, violated the Eighth Amendment by failing to immediately transfer him to a medical center after he initially complained of severe neck pain on January 7, 2012, to expedite his requests to see a psychiatrist or neurologist, and to afford him work and meal accommodations in light of his medical condition. (Compl. ¶¶ 22, 27–29.) Hill similarly claims that the Corizon Defendants, most notably Drs. Malachinski and Lund, acted with deliberate indifference when they failed to promptly refer him to a specialist, transfer him to a medical center, or admit him to the DOC's medical unit; timely refill his prescriptions for Neurontin and Flexeril after they had expired or provide him with alternative medicines in the interim period; and promptly provide him with a lower bunk accommodation. (*Id.* ¶¶ 9, 17, 22–26.) He also contends that Dr. Malachinski "knowingly compelled" him to take Lisinopril, which he "believes" caused his dystonia. (*Id.* ¶ 30.) Hill requests monetary damages, declaratory relief, and injunctive relief against all Defendants, though his complaint does not indicate whether he is suing the individual DOC Defendants in their personal or official capacities. (*Id.* ¶¶ 31–46.)

## II.  DISCUSSION

The Corizon and DOC Defendants have separately moved for summary judgment on Hill's Eighth Amendment claims. (Doc. No. 64, Corizon Defs. Mot. for Summ. J.;

15

Doc. No. 77, DOC Defs. Am. Mot. for Summ. J.) The DOC Defendants contend that Hill's claims against them are either barred by the Eleventh Amendment or the Prison Litigation Reform Act's ("PLRA") exhaustion requirement, and that Hill has otherwise failed to demonstrate that they violated the Eighth Amendment or are not entitled to qualified immunity. (Doc. No. 70, DOC Defs.' Mem. of Law 10–24.) The Corizon Defendants challenge Hill's claim solely on the merits, asserting that they did not act with deliberate indifference to Hill's dystonia, but rather, "engaged in a differential process to rule out causes of his spasms and provided appropriate and beneficial treatment." (Doc. No. 68, Corizon Def.'s Mem. of Law 1.) In response, Hill has filed a self-styled Motion in Opposition to Defendants' Motions for Summary Judgment, in which he argues that the Defendants were deliberately indifferent to his medical needs and that the DOC Defendants are not entitled to qualified immunity.[7] (Doc. No. 79, Pl.'s Mot. in Opp. to Defs.' Mots. for Summ. J.; Doc. No. 80, Pl.'s Mem. of Law 29.)

---

[7]   Hill complains that Drs. Paulson, Malachinski, and Lund have provided "no proof" to support many of the assertions made in their sworn declarations or affidavits. (Doc. No. 80 at 25–26.) The doctors' assertions, however, are based in part on Hill's medical records, and, even where they are not, sworn statements—as opposed to unsworn allegations—are proof. *See Wolfson v. Allianz Life Ins. Co. of N. Am.*, No. 14-4469, 2015 WL 2194813, at (D. Minn. May 11, 2015) (explaining that a sworn statement, such as witness testimony, "is still proof" no matter "how self-serving or uncorroborated by documentary evidence") (citing *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1246–47, 1253 (11th Cir. 2013), and *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)); *see also* Fed. R. Civ. P. 56(c)(1)(A) (providing that a party seeking or opposing summary judgment may support a fact through the submission of various types of evidence, including "affidavits or declarations").

## A.  Standard of Review

Summary judgment is appropriate if the evidence in the record, when viewed in the light most favorable to the nonmoving party and with all reasonable inferences drawn therefrom, shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Thomas v. Heartland Emp't Servs., LLC*, 797 F.3d 527, 529 (8th Cir. 2015). The moving party "bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions [of the record] which . . . demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If it does so, the nonmoving party "may not . . . rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (quotation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials . . . ."). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

**B.  Hill's Claims against the DOC Defendants**

Hill claims that the DOC Defendants violated his Eighth Amendment rights by failing to immediately transfer him to a medical center after he initially complained of neck pain on January 7, 2012, to expedite his request to see a psychiatrist or neurologist, and to grant him meal and work accommodations. (Compl. ¶¶ 22–30.) As explained below, this Court finds that Hill's claims against the DOC Defendants are barred by the Eleventh Amendment and the PLRA's exhaustion requirement.

**1.  Eleventh Amendment Immunity**

The Eleventh Amendment bars federal courts from entertaining private suits against a state or a state agency absent waiver or valid congressional override of the state's sovereign immunity. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Humenansky v. Regents of Univ. of Minn.*, 152 F.3d 822, 823–24 (8th Cir. 1998). Eleventh Amendment immunity extends to state officials sued for damages in their official capacities, as such suits are "against the official's office" and, thus, are "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Graham*, 473 U.S. at 169 (noting that the Eleventh Amendment applies when "State officials are sued for damages in their official capacity" because "a judgment against a public servant in his official capacity imposes liability on the entity that he represents") (quotations omitted). While the Eleventh Amendment does not bar damages claims against state officials acting in their individual capacities, a plaintiff who wishes to assert personal-capacity claims must clearly say so in his complaint, both to ensure that the officials receive adequate notice of their exposure to personal liability and

18

because of the Eleventh Amendment's constraints. *See, e.g.*, *Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999); *Artis v. Francis Howell N. Band Booster Ass'n Inc.*, 161 F.3d 1178, 1182 (8th Cir. 1998); *Murphy v. State of Ark.*, 127 F.3d 750, 754–55 (8th Cir. 1997). The requirement "that personal capacity claims be clearly-pleaded" is strictly enforced in this circuit, even against *pro se* plaintiffs. *See Murphy*, 127 F.3d at 755; *Gray v. Ark. Dep't of Human Servs.*, 406 F. App'x 84, 84 (8th Cir. 2010) (involving *pro se* plaintiff). "If a plaintiff's complaint is silent about the capacity in which he is suing the defendant" and "does not specifically name the defendant in his individual capacity, it is presumed he is sued only in his official capacity." *Baker v. Chisom*, 501 F.3d 920, 923 (8th Cir. 2007) (quotations omitted).

Here, the DOC, as a state agency, is entitled to Eleventh Amendment immunity on Hill's claims, regardless of the relief sought, because Minnesota has not waived its sovereign immunity from suit in federal court and Congress did not abrogate that immunity when it enacted § 1983. *See Will*, 491 U.S. at 66 ("Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity . . . ."); *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 800 (8th Cir. 2002) (noting that Minnesota has not waived its sovereign immunity from suit in federal court); *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) (explaining that the Eleventh Amendment bars federal lawsuits against states or state agencies for any kind of relief). Moreover, because Hill's complaint is silent about the capacity in which he is suing the individual DOC officials, his claims against them are presumed to be in their official capacity only. *Andrus*, 197 F.3d at 955 ("[I]f a complaint is silent, or only hints at the capacity in which a state officer is sued

. . . , the complaint should be interpreted as an official-capacity claim. In actions against officers, specific pleading of individual capacity is required to put public officials on notice that they will be exposed to personal liability . . . .") (quotation omitted). Although Hill is *pro se*, and although he now states that he wishes to sue the DOC officials in both their individual and official capacities (*see* Doc. No. 80 at 29), neither of those facts excuses his failure to expressly assert personal-capacity claims in his complaint. *See Murphy*, 127 F.3d at 755 (explaining that the requirement that "personal capacity claims be clearly-pleaded" is "strictly enforced" and holding that "the district court erred in excusing [the plaintiff's] failure to clearly assert personal capacity claims in his initial complaint"); *Gray*, 406 F. App'x at 84 (concluding that a *pro se* plaintiff's complaint was "properly construed as asserting only official-capacity claims" because it "was silent as to the capacity in which she was suing defendants"). Hill's damages claims against the DOC officials are therefore barred by the Eleventh Amendment as well.[8]

### 2. The PLRA's Exhaustion Requirement

The Eleventh Amendment does not bar Hill's claims against the individual DOC officials for declaratory or prospective injunctive relief. *See Rose v. State of Neb.*, 748 F.2d 1258, 1262 (8th Cir. 1984) ("[S]uits for declaratory and injunctive relief against state officials, as opposed to the state itself or one of its agencies, are not barred by the

---

[8]     Even if Hill had specifically pleaded individual-capacity claims against the DOC officials and thereby avoided the Eleventh Amendment bar, those claims would still be subject to dismissal for the same reasons, discussed below, that he has not properly exhausted his administrative remedies and has not shown that the Corizon Defendants violated his Eighth Amendment rights.

Eleventh Amendment."). But those claims for equitable relief are nevertheless subject to dismissal because Hill has not properly exhausted his administrative remedies, as required by the PLRA.[9]

The PLRA's exhaustion requirement provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). To satisfy this requirement, an inmate must pursue the prison's grievance process to its final stage in accordance with all applicable procedural rules, including deadlines. *See Jones v. Bock*, 549 U.S. 199, 217–18 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006); *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014). If a prisoner does not properly exhaust his claims before filing suit, "dismissal is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003). While dismissal for failure to exhaust is typically without prejudice, summary judgment is appropriate when the prisoner can no longer properly exhaust his claims due to a procedural bar, such as the expiration of an applicable deadline. *See Parks v. Dooley*, No. 09-3514, 2011 WL 847011, at *17 (D. Minn. Feb. 11, 2011) ("Having failed to timely and completely grieve his complaints . . . all claims by [the plaintiff] against these defendants are barred for failure to exhaust administrative

---

[9]     Unlike the DOC officials, the Corizon Defendants are not entitled to summary judgment based on the PLRA's exhaustion requirement because they have not raised the issue. *See Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) ("Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion.").

remedies . . . and summary judgment on these claims against them should be granted."), *adopted in relevant part by* 2011 WL 841278 (D. Minn. Mar. 8, 2011); *Allen v. Jussila*, No. 08-6366, 2010 WL 3521934, at *9 (D. Minn. Aug. 5, 2010) ("[B]ecause Allen can no longer exhaust his claims [due to the expiration of an applicable deadline], he has procedurally defaulted on them and his suit is precluded forever and must be dismissed with prejudice."), *aff'd* 430 F. App'x 555 (8th Cir. 2011).

The DOC has an established grievance procedure that inmates may use to grieve nearly any issue concerning their conditions of confinement, one that consists of three basic steps. (Ebeling Aff. ¶¶ 2–3.) First, an inmate must attempt to informally resolve an issue by sending written kites to the relevant officers and, if dissatisfied with their response, proceeding up the chain of command. (*Id.* ¶ 3 & Ex. A at 5, 10.) Second, if those informal attempts at resolution are unsuccessful, the prisoner may file a formal grievance by completing an Offender Grievance form and submitting it to the correctional facility's grievance coordinator. (Ebeling Aff. ¶ 3 & Ex. A at 6, 11.) A formal grievance must be filed within a specified number of days from the "occurrence of the issue being grieved," which was thirty days prior to September 2012 and forty-five days thereafter. (*See* Ebeling Aff. ¶ 3 & Ex. A at 6, 11.) Third and finally, if the inmate is dissatisfied with the facility's decision on his grievance, he may file a grievance appeal within fifteen working days of that decision. (Ebeling Aff. ¶ 3 & Ex. A at 2, 7, 13.) Once that appeal is addressed by the Commissioner of Corrections, the Assistant Commissioner, or the Deputy Commissioner, no further appeals are permitted and the formal grievance procedure is at an end. (Ebeling Aff. ¶ 3 & Ex. A at 8, 13.)

The record shows that Hill submitted a single grievance regarding his medical care on April 16, 2012. (*See* Compl., Attach. 1 at 1–2.) Per DOC policy, Hill was instructed to first submit kites and follow them up the chain of command before filing a formal grievance with the facility's grievance coordinator. (*See id.* at 1; Ebeling Aff. ¶ 4.) Despite those instructions, Hill did not submit any formal grievances after April 2012, let alone appeal their denial. (*See* Ebeling Aff. ¶ 5.) He has therefore failed to properly exhaust his administrative remedies by completing the DOC's established grievance process to its final stage and in accordance with all applicable procedural rules. *See Jones*, 549 U.S. at 217–18; *Burns*, 752 F.3d at 1141.

In an effort to excuse his failure to comply with the PLRA's exhaustion requirement, Hill alleges that, until he received a cervical collar in March 2012, he was physically unable to write kites or grievances because he could not hold his "head still long enough to see the paper when writing." (Compl. ¶ 15.) Proper exhaustion of administrative remedies, however, is "mandatory" and not "left to the discretion of the district court," *Woodford*, 548 U.S. at 85, and the Eighth Circuit has not recognized an exception to that requirement for medical conditions. *See Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005) ("We have only excused inmates from complying with an institution's grievance procedures when officials have prevented prisoners from utilizing the procedures or when officials themselves have failed to comply with the grievance procedures.") (citations omitted); *Hahn v. Armstrong*, 407 F. App'x 77, 79 (8th Cir. 2011) ("[T]his Court has not recognized exceptions to the PLRA's exhaustion requirement for delay due to medical treatment . . . .").

23

Even if such an exception existed, Hill would not be entitled to benefit from it for several reasons. First, Hill has not presented any evidence to support his unsworn allegations that he was physically unable to write kites or grievances prior to March 2012, and the evidence that is in record undermines that allegation. (*See* Paulson Aff. ¶ 57 (testifying that, based on Hill's medical records, it is unlikely that he was unable to write kites).) In an effort to substantiate his claimed inability to write kite or grievances, Hill has submitted an article by Lisa Todd recounting her personal experience with cervical dystonia, including her inability to "write a card or wrap a present for [her] little girl." (Doc. No. 81, Ex. 8). Standing alone, however, Lisa Todd's personal experience with dystonia hardly supports an inference that Hill's own condition rendered him unable to write kites or grievances, especially in light of the evidence showing that dystonia can vary wildly in both symptoms and severity. (*See* Malachinski Decl. ¶ 7; Doc. No. 81, Exs. 7, 9.) And even if did, Lisa Todd's article is inadmissible hearsay and, thus, cannot serve to defeat the DOC Defendants' motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(4) (providing that materials used to support or oppose a summary-judgment motion must "set out facts that would be admissible in evidence"); *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) (explaining that out-of-court statements are "inadmissible hearsay" and "may not be used to support or defeat a motion for summary judgment").

Second, even if Hill had presented sufficient evidence on this score, the DOC's grievance procedure includes an accommodation for prisoners who are personally unable to comply with its demands, allowing inmates to "obtain assistance from another

24

offender, facility staff, family members, or attorneys" in preparing timely grievances. (*See* Ebeling Aff., Ex. A. at 2.) There is no indication, however, that Hill ever sought assistance in writing kites and submitting timely grievances while he was allegedly unable to do so himself.

Finally, after Hill's sole grievance was rejected for failing to first write kites and follow them up the chain of command, as required by the DOC's grievance policy, Hill did not submit any additional grievances and appeal their denial. Hill's alleged inability to personally write kites and grievances prior to March 2012 cannot excuse his failure to seek outside assistance in complying with the DOC's established grievance procedure, let alone his failure to submit proper grievances and appeal any denials after March 2012.

Because Hill has failed to satisfy the PLRA's exhaustion requirement, and since he can no longer properly exhaust his claims due to the expiration of the applicable deadlines for initiating formal grievance procedures, the individual DOC officials are entitled to summary judgment on his claims for declaratory and injunctive relief.[10]

## C.  Hill's Claims against the Corizon Defendants

Hill alleges that the Corizon Defendants violated his Eighth Amendment rights when they failed to promptly transfer him to an outside medical center, admit him to the

---

[10]     Given this Court's conclusion that the Eleventh Amendment bars Hill's damages claims against the DOC officials in their official capacity, and that Hill's failure to exhaust his administrative remedies bars any claims for declaratory or injunctive relief, it need not address the DOC Defendants additional arguments for summary judgment. In any event, even if this Court were to reach the merits of Hill's Eighth Amendment claims against the DOC Defendants, they would fail for largely the same reasons that Hill has not shown an Eighth Amendment violation on the part of the Corizon Defendants.

DOC's medical unit, or refer him to a specialist; failed to timely refill his prescriptions for Neurontin and Flexeril after they had expired or provide alternative medications in the interim period; failed to immediately accommodate his requests for a lower bunk accommodation; and caused his dystonia by prescribing Lisinopril for his hypertension. (Compl. ¶¶ 12, 22–26.) In moving for summary judgment, the Corizon Defendants contend that Hill cannot establish that they were deliberately indifferent to his medical needs because they "engaged in a differential process to rule out causes of his spasms and provided appropriate and beneficial treatment for his condition." (Corizon Def.'s Mem. of Law 1.)

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation and ellipsis omitted). An Eighth Amendment claim consists of both objective and subjective components, which respectively ask whether the alleged injury was "objectively harmful enough" and whether prison officials subjectively acted with a "sufficiently culpable state of mind." *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992). What a prisoner must establish with respect to each element, however, "varies according to the nature of the alleged constitutional violation." *Id.* at 5. For claims alleging inadequate medical care, a prisoner must show both that he was suffering from "an objectively serious medical need and that prison officers knew of the need but deliberately disregarded it." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). For claims challenging other conditions of

confinement, a plaintiff must establish that prison officials deliberately disregarded "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The deliberate-indifference standard requires a mental state "akin to criminal recklessness," demanding that prison officials consciously disregarded a known and substantial risk of serious harm through actions that were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *See Jackson v. Buckman*, 756 F.3d 1060, 1065–66 (8th Cir. 2014) (quotations omitted); *see also Farmer*, 511 U.S. at 837–38 (1970); *Dulany v. Carnahan*, 132 F.3d 1234,  1240–42 (8th Cir. 1997). A prisoner "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quotation omitted). Failure to receive a requested course of medical treatment or evidence implicating a medical professional's judgment do not raise a constitutional issue, as "[p]risoners do not have a constitutional right to any particular type of treatment" and "[p]rison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). Moreover, because a "prison official's duty under the Eighth Amendment is to ensure reasonable safety," officials "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844 (quotation omitted).

In seeking summary judgment, the Corizon Defendants do not challenge Hill's contention that his dystonia constitutes an objectively serious medical need; instead, they argue that they were not deliberately indifferent to that need. (Corizon Defs.'s Mem. 22–27.) This Court agrees. Even assuming for the sake of argument that the muscle spasms, tics, and pain associated with Hill's dystonia rise to the level of a serious medical need,[11] the evidence fails to establish that Dr. Lund, Dr. Malachinski, or Corizon LLC deliberately disregarded that need. Each of Hill's specific claims against the Corizon Defendants will be addressed in turn.

1. **Failure to Promptly Refer Hill to a Specialist or Transfer him to a Medical Unit**

Hill claims that the Corizon Defendants acted with deliberate indifference when they failed to promptly transfer him to an outside medical center, admit him to the DOC's medical unit, or refer him to a specialist for diagnosis and treatment after he began complaining of neck pain and spasms in January 2012. (Compl. ¶¶ 9, 17, 22–23, 26.) At heart, Hill faults Drs. Malachinski and Lund for not immediately diagnosing his condition as cervical dystonia and treating that specific condition, complaining that "the pain and

---

[11]    Notably, the DOC Defendants (unlike the Corizon Defendants) argue that Hill's medical condition does not rise to the level of an objectively serious medical need because, although "chronic" and "uncomfortable," it is not life-threatening and does not otherwise pose an imminent danger to his overall health. (DOC Defs.'s Mem. 18.) While there might be some merit to that argument, this Court need not decide the issue given that the DOC Defendants are entitled to summary judgment on procedural grounds, the Corizon Defendants have not disputed that Hill suffers from a serious medical need, and the evidence does not support a finding of deliberate indifference regardless of the objective seriousness of Hill's medical condition.

suffering" he had experienced "could have been avoided if [he] had seen Dr. Hardrict sooner." (Compl. ¶ 17.)

For Hill to withstand summary judgment on his claim, there must be enough evidence from which a rational jury could conclude that Drs. Malachinski and Lund deliberately disregarded his medical needs through actions that were more than negligent or even grossly negligent, but instead were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *See Fourte v. Faulkner Cnty. Ark*, 746 F.3d 384, 387 (8th Cir. 2014). The evidence in the record, however, does not support that conclusion. The record shows that from the time Hill started to report muscle spasms and pain, Drs. Malachinski and Lund performed numerous examinations, x-rays, and lab tests in an effort to diagnosis and rule out possible causes of Hill's symptoms, including brain injury, muscle inflammation, and electrolyte imbalances. (*See* Malachinski Decl. ¶¶ 7, 9–10, 15–17, 69; Lund Aff. ¶¶ 11–13, 20, 29, 35, 38, 62; Paulson Aff. ¶¶ 11–16, 24–25, 56; Medical R. 66–71.) They prescribed muscle relaxants (Robaxin and Flexeril), an anticonvulsant medication also used to treat pain (Neurontin), metabolic medicines (magnesium oxide and calcium carbonate), and various stretching exercises in an attempt to relieve Hill's symptoms. (*See* Malachinski Decl. ¶¶ 9, 33; Lund Aff. ¶¶ 11–14, 63; Paulson Aff. ¶¶ 11–12, 14, 18, 24–25; Medical R. at 66–71, 295.) They also referred Hill to a dentist to determine whether his facial grimacing was the result of any structural abnormalities of the mouth, to a registered physical therapist who fitted Hill with a cervical collar, and, after all their efforts proved unsuccessful, to an outside psychiatrist

certified in neurology. (*See* Malachinski Decl. ¶¶ 9, 15–16, 22; Lund Aff. ¶¶ 34–35, 62; Paulson Aff. ¶¶ 19–20, 26; Medical R. 68–71, 79.)

Although Drs. Malachinski and Lund did not formally diagnose Hill with cervical dystonia or immediately refer him to a specialist, those facts do not support a finding that their actions amounted to the unnecessary and wanton infliction of punishment forbidden by the Eighth Amendment. Dystonia is a rare and incurable condition of often unknown origin whose characteristic symptom—involuntary muscle spasms—is shared with more common conditions, such as those that the prison doctors attempted to diagnosis and treat. (*See* Malachinski Decl. ¶¶ 7, 10, 69; Paulson Aff. ¶¶ 47–48.) Moreover, the muscle relaxants, pain medications, and stretches prescribed by the doctors, as well as the physical therapy and neck brace that Hill received, are commonly used to treat dystonia and periodically relieved some of his symptoms. (*See* Malachinski Decl. ¶ 7; Lund Aff. ¶¶ 11–12, 26, 30; Paulson Aff. ¶¶ 47–48, 55; Doc. No. 81, Exs. 4, 7; Medical R. at 66–67, 69–70, 79.) Indeed, after Dr. Hardrict provisionally diagnosed Hill with dystonia in October 2012—a diagnosis itself which was later questioned and was not firmly established until Dr. Truitt's July 2014 neurological consult—he continued many of the treatments previously provided to Hill, including muscle relaxants, Neurontin, and a cervical collar, precisely because they provided some benefit. (*See* Paulson Aff. ¶¶ 26, 31; Malachinski Decl. ¶¶ 30, 34, 56–57; Medical R. at 26–28, 39, 41, 50, 61.) And the additional medications that Dr. Hardrict and his successors prescribed—Cogentin, Haldol, Prolixin, Amandatine, Levodopa, and Clonazepam—ultimately proved just as

30

unsuccessful at treating Hill's spasms in the long run. (*See* Paulson Aff. ¶¶ 27, 30, 34, 40, 46; Malachinski Decl. ¶¶ 66–68; Medical R. at 47, 57–58.)

With the benefit of hindsight, Drs. Malachinski and Lund could potentially have acted differently to arrive at an earlier diagnosis of dystonia or pursued alternative treatments. But the Eighth Amendment question cannot be answered "with hindsight's perfect vision," *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (quotation omitted), and the doctors' failure to pursue alternative courses of action simply does not rise to the level of a constitutional violation. *See id.* ("While Jennings could have acted differently in the situation and while her actions may even be considered negligent under the circumstances, her conduct does not constitute deliberate indifference as a matter of law.") (quotation omitted); *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997) (explaining that a prison doctor's failure to refer an inmate "to a specialist as quickly as hindsight perhaps allows us to think they should have" does not rise to the level of deliberate indifference); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (noting that courts are hesitant to "find an eighth amendment violation when a prison inmate has received medical care" and that a violation requires "more than a medical judgment call, an accident, or an inadvertent failure") (quotation omitted). The Eighth Amendment's ban on cruel and unusual punishment does not "prevent[] prison doctors from exercising their independent medical judgment" or demand "any particular type of treatment." *Long*, 86 F.3d at 765. It only requires prison doctors to mount some reasonable response to a perceived risk of harm, whether or not the harm is ultimately averted, through actions that are not so beyond the pale as to evidence intentional maltreatment. *See Farmer*, 511 U.S.

at 844–45; *Jackson*, 756 F.3d at 1065–66. Drs. Malachinski and Lund's documented efforts to treat and diagnosis Hill's condition meet that constitutional standard. *See Logan*, 119 F.3d at 649 ("We think the efforts the prison doctors took to allay Logan's pain, while perhaps not as extensive as those a private health-care provider might have taken, did not reflect deliberate indifference to his medical needs.").

While the Court is sympathetic to Hill's ongoing medical issues, his disagreement with Drs. Malachinski and Lund's treatment decisions are not sufficient to show that they acted with deliberate indifference to his medical needs.[12] *See Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014) ("A mere difference of opinion over matters of expert medical judgement or a course of medical treatment fails to rise to the level of a constitutional violation."); *Dulany*, 132 F.3d at 1240 ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment."). Some medical conditions simply defy ready diagnosis and effective long-term treatment; according to the record in this case, Hill's dystonia maybe one of them. (*See* Paulson Aff. ¶ 50.) Indeed, Hill's own submissions underscore how elusive and intractable dystonia can be, indicating that its causes are

---

[12] Defendant T. Warner has not joined either of the pending motions for summary judgment or otherwise responded to Hill's complaint, though it is unclear from the record whether she was properly served in this case. In any event, Hill's claim that T. Warner's failure to transfer him to a specialist or medical center constitutes deliberate indifference to his serious medical needs fails for the same reasons that Hill has not shown that the Corizon Defendants violated his Eighth Amendment rights.

seldom known, that "there are no medications to prevent [it] or slow its progression," and that its symptoms are "notorious" for changing unpredictably over time "depending on a number of factors," including stress and fatigue. (Doc. No. 81, Exs. 7, 9.)

### 2. The Delay in Refilling Hill's Prescriptions and Failure to Provide Alternative Medication in the Interim

Hill further asserts that Drs. Malachinski and Lund's failure to promptly refill his prescriptions for Neurontin and Flexeril after he requested them on February 17, 2012, or to provide alternative pain medications until those prescriptions could be refilled, constitute deliberate indifference to his medical needs. (Compl. ¶¶ 23–24.) This Court disagrees.

On February 17, 2012, Hill notified health services that he was suffering from severe pain and requested to see a doctor to renew his prescriptions for Neurontin and Flexeril, both of which had expired two days earlier. (Malachinski Decl. ¶ 17; Lund Aff. ¶ 16.) A nurse advised Hill that there were no appointments available that day and that he would have to wait until Dr. Lund returned to work on February 22, 2012. She offered Hill over-the-counter pain medications, which he refused. (*See* Paulson Aff. ¶ 17; Lund Aff. ¶ 16; Malachinski Decl. ¶¶ 17–18.) Dr. Lund examined Hill as soon as he returned to work on February 22, refilled Hill's Flexeril and Neurontin prescriptions that very day, and reordered those medications on February 27. (Lund Aff. ¶ 23.) Although the prescribed Flexeril became available on February 27, Hill did not attend pill call to receive it until March 6. (*Id.*) Moreover, Hill's Neurontin prescription was not available

until March 8 due to problems with the outside pharmaceutical company that provided the medication. (*See* Lund Aff. ¶ 23; Compl. ¶ 12.)

While deliberate indifference to substantial pain and suffering violates the Eighth Amendment, the evidence in the record does not support Hill's allegations that the delay in refilling his prescriptions left him in severe pain or that Drs. Malachinski and Lund knowingly ignored any such pain. *See Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (noting that knowingly disregarding "an objectively serious medical need," including "pain and suffering" or "lingering death," violates the Eighth Amendment) (quotations omitted); *Jenkins v. Cty. of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009) ("[D]elayed treatment is not unconstitutional unless it evinces deliberate indifference to serious medical needs. The Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish."); *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–94 (10th Cir. 2014) (explaining that pain must be substantial or severe to support an Eighth Amendment claim). Although Hill alleges that he was in excruciating pain without his medications, the evidence in the record shows that he refused over-the-counter pain medications on February 17, did not return to health services in the coming days or weeks to report that he was suffering from severe pain, and when Dr. Lund finally examined him on February 22, he did not appear to have any immediate need for analgesics. (*See* Lund Aff. ¶ 26; Medical R. at 67.) Dr. Lund nonetheless ordered refills of Hill's prescriptions on February 22 and again on February 27. Although one of those prescriptions became available on February 27, medical records indicate that Hill did not attend pill call to retrieve it until March 6. And the fact

that the second medication did not become available until March 8 was not a function of any knowing indifference on the part of Drs. Lund or Malachinski, but an outside pharmaceutical company's inability to immediately refill the prescription.

Hill has not presented any actual evidence—as opposed to unsworn allegations—to support an inference that the temporary absence of Neurontin, Flexeril, or any other medication exposed him to severe pain and suffering, let alone that the prison doctors were actually aware of such suffering and deliberately disregarded it. *See Farmer*, 511 U.S. at 837–38 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference . . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under our cases be condemned as the infliction of punishment."). Accordingly, this Court finds that the Corizon Defendants are entitled to summary judgment on Hill's Eighth Amendment claim concerning the delay in receiving refills of his Neurontin and Flexeril prescriptions.

### 3.   Defendants' Delayed Response to Hill's Request for a Lower Bunk Accommodation

Hill also alleges that Drs. Malachinski and Lund violated his Eighth Amendment rights when they failed to provide him with a medical accommodation for a lower bunk for the eleven-month period between January and November 2012. (Compl. ¶ 25.) Again, this Court disagrees.

The Constitution "does not mandate comfortable prisons"; it merely prohibits "inhumane ones." *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quotation omitted).

To establish that a particular condition of confinement violates the Eighth Amendment, "the prisoner must show that (1) the alleged deprivation is, objectively, sufficiently serious, resulting in the denial of the minimal civilized measure of life's necessities, and (2) that the prison officials were deliberately indifferent to an excessive risk to inmate health or safety, meaning that the officials actually knew of and disregarded the risk." *Id.* (quotations omitted). Absent a showing of conscious disregard for an excessive risk to inmate health or safety, "the conditions are not a 'punishment' within the meaning of the Eighth Amendment." *Id.*

The eleventh-month delay in affording Hill a lower bunk accommodation did not deprive him of "the minimal civilized measure of life's necessities," nor has Hill presented any evidence that having to sleep in a top bunk exposed him to an "excessive risk to [his] health or safety." *See Williams*, 49 F.3d at 445; *see also Turner v. Kight*, 121 F. App'x 9, 13–14 (4th Cir. 2005) (holding that the denial of a neck brace and other medical accommodations did not rise to the level of an Eighth Amendment violation where, despite the inmate's alleged pain, there was no evidence of a "sufficiently serious" medical need for the accommodations or that the deprivation resulted in "substantial injury"). While Hill complains that it "was hard for [him] to get up in the top bunk" and that he "was miserable climbing the la[dd]er" in his condition (Compl. ¶¶ 7, 12), whatever discomfort or hardship he endured as a result of having to sleep in a top bunk is not "sufficiently grave to form the basis of an Eighth Amendment violation." *See Hudson*, 503 U.S. at 9 (noting that "routine discomfort is part of the penalty that criminal offenders pay for their offenses against society" and that "extreme deprivations" of "the

minimal civilized measure of life's necessities" are necessary "to make out a conditions-of-confinement claim") (quotations omitted); *see also Wilson*, 501 U.S. at 298 (explaining that while a particular prison condition might "inflict[] pain," only those "deprivations denying the minimal civilized measure of life's necessities" amount to the "unnecessary and wanton infliction of pain that violates the Eighth Amendment") (quotations omitted); *Farmer*, 511 U.S. at 833 ("Prison conditions may be restrictive and even harsh [without violating the Eighth Amendment]."). Just as significantly, Hill has not presented evidence from which a reasonable jury could infer that Drs. Malachinski and Lund actually knew that a top-bunk placement created an excessive risk to Hill's health and deliberately disregarded that risk. Indeed, once Hill was diagnosed with cervical dystonia, Dr. Lund authorized a lower bunk accommodation.

### 4. Defendants' Knowingly Compelled Hill to Take Medication that Ultimately Caused his Dystonia

Finally, Hill alleges that Dr. Malachinski "knowingly compelled [him] to take medication"—namely, Lisinopril for his hypertension—which Hill believes caused his dystonia. (Compl. ¶ 30.) In support of that belief, Hill has submitted printouts of web pages from the Mayo Clinic and the National Institute of Health ("NIH"), which note that dystonia can be idiopathic (*i.e.*, of unknown origin), genetic, or acquired, the latter of which may result from "certain types of medications," notably "specific antipsychotic or anti-nausea agents." (Doc. No. 81, Ex. 4, 7.)

Based on the evidence in the record, this Court finds that no rational jury could conclude either that Lisinopril caused Hill's dystonia or that Dr. Malachinski knowingly

disregarded any such causal risk. To begin, Hill is not qualified to render an opinion about the underlying medical causes of his dystonia, even with the aid of his online research, and he has not presented any evidence from a qualified medical expert to substantiate his belief that Lisinopril caused his dystonia. *See In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 960 (D. Minn. 2009) (refusing to accept an epidemiologist's causation opinion because he was a not a medical doctor and therefore not qualified to diagnose the cause of the plaintiff's vision loss). Moreover, the record overwhelmingly suggests that Hill's dystonia is idiopathic; none of Hill's treating physicians have determined that Hill suffers from acquired dystonia, let alone connected such a condition to Lisinopril. (*See* Malachinski Decl. ¶ 7; Lund Aff. ¶¶ 7, 59; Medical R. at 26–28, 50, 58, 61.) Even Dr. Hardrict, who initially diagnosed Hill with dystonia, noted that Hill had "not taken any medications which might precipitate [] an acute dystonic reaction." (Medical R. at 50.) And Dr. Malachinski, who unlike Hill is qualified to offer a medical opinion, has testified that he is "not aware of any peer reviewed study that has found Lisinopril causes dystonia" and that he "would not have placed Hill on Lisinopril if [he] thought [Hill] was at risk of developing dystonia from the medication." (Malachinski Decl. ¶ 8.) Not even the printouts provided by Hill specifically link Lisinopril to acquired dystonia; at most, they indicate that dystonia may be caused by "specific antipsychotic or anti-nausea agents." Lisinopril is a blood pressure medication, not an antipsychotic or anti-nausea agent. Hill's unsubstantiated speculation that Lisinopril caused his dystonia is not sufficient to withstand summary judgment, both because he has not presented any

competent evidence tending to show that to be the case or, just as importantly, that Dr. Malachinski consciously disregarded any such risk.

## CONCLUSION

This Court finds that Hill's Eighth Amendment claims against the DOC Defendants are barred, either in whole or in part, by the Eleventh Amendment or the PLRA's exhaustion requirement. This Court further finds that the evidence, even when viewed in the light most favorable to Hill, is insufficient to create a genuine trial issue as to whether the Corizon Defendants, particularly Drs. Malachinski and Lund, acted with deliberate indifference to his medical needs or to an excessive risk to his health or safety. Accordingly, this Court recommends that the Corizon Defendants' motion for summary judgment and the DOC Defendants' amended motion for summary judgment be granted, that Hill's motion in opposition to summary judgment be denied, and that this case be dismissed in its entirety.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Defendants Leon Malachinski, Kristofer Lund, and Corizon LLC's motion for summary judgment (Doc. No. 64) be **GRANTED**;

2.      Defendants Minnesota Department of Corrections, Sergeant Lisa Connors, Nurse Nola Karow, and Officer Vickie Pohlmann's amended motion for summary judgment (Doc. No. 77) be **GRANTED**;

      3.      Plaintiff Anthony Hill's motion in opposition to Defendants' motions for summary judgment (Doc. No. 79) be **DENIED**; and

      4.      This action be **DISMISSED WITH PREJUDICE**.

Date: December 30, 2015

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report by **January 15, 2016**. A party may respond to these objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).